# Cawood v. Cawood's Adm'x et al.

Dec. 13, 1940.

J. B. Snyder and Richard P. Dietzman for appellant.

E. C. O'Rear and Allen Prewitt for appellees.

OPINION OF THE COURT BY MORRIS, COMMISSIONER—
Affirming.

S. M. Cawood died January 31, 1924, intestate, leaving his widow and eight children, several being infants. In March following, J. F. Cawood, a brother, qualified as administrator with G. T. Cawood, W. F. Ball and W. M. Pope sureties. On January 19, 1929, suit was instituted against the administrator by the widow and children, seeking settlement.

The administrator answering admitted qualification and appraisement ($59,772), and without defensive matter, closed with assurance that he would in "the course of a few days give accounting of his trust." The court referred the matter to a commissioner, and directed the administrator to report by March 25. Time was later extended to April 15. There was no compliance, and on January 23, 1930, plaintiffs amended, and still insisting on settlement, asked other relief. This amendment brought in J. F. Cawood individually and new sureties mentioned later. It was shown that on Februray 4, 1927, the county court had required additional sureties, the latter being E. V. and H. H. Pope, and F. F. Cawood (a nephew), sole appellant here.

There came to the administrator's hands two notes, each for $10,000, executed to intestate by J. F. and G. T. Cawood, of date June 1, 1923, due January 1, 1927 and January 1, 1928, which were unaccounted for, and it was charged that J. F. and sureties were liable to the estate for the notes. On July 1, 1930, the county court removed him and appointed a bank in his stead, and he was ordered to report to the circuit court. On this date the bank reported, showing receipts and disbursements. The bank then in receivership was allowed to resign

and Ava Whitehead, daughter of intestate, qualified as administratrix. She later asked to be permitted, with the other heirs at law, to prosecute further. She showed still existing debts, lack of funds to pay, asked settlement, and judgment against J. F. and his sureties.

Appellant and other sureties moved to require plaintiffs to elect whether they would prosecute suit for settlement, or on the amendment seeking to recover on the notes. The court gave the administratrix until July 1934 to report, and sustained the demurrers of sureties to the amended petition, because it failed to allege that at the time of execution of the bonds J. F. Cawood was solvent. He demurred because of improper parties, and joined in the motion to require election. The defect pointed out was cured, and the court overruled special demurrer, but sustained motion to require election; plaintiffs elected to prosecute on the notes.

Sureties then filed answer denying such allegations of the petition as charged their liability; admitting that "the notes came into the hands of the administrator and appraised as alleged", they said that since not due until January 1, 1927 and 1928 respectively, the notes were "not collectible until they became due"; that when due J. F. and G. T. Cawood were hopelessly insolvent. They asserted that they were not obligated on the original bond, but signed "renewal" on February 4, 1927, at which time the principal was insolvent, and was so during the period of administration.

J. F. Cawood in separate answer contended that when he signed the notes it was agreed that they were to be paid by G. T. Cawood, and that up to due date, he in good faith believed him solvent. He said he later endeavored to have him secure payment by mortgage, but that within four months G. T. was thrown into bankruptcy, and that at no time since qualification was he able to collect or pay any part of the notes. The answers also raised the question of right of plaintiffs to maintain suit.

The notes were in part consideration for the purchase of a tract of land at "Cawood" for $80,000, of which $30,000 was paid by J. F., and $10,000 by G. T., leaving a balance represented by four notes. J. F. contended that it was agreed between them that he would pay one and G. T. the three $10,000 notes, so as to equal-

ize purchase payments, and that G. T. paid one of the notes and he satisfied another by reason of credits due him, thus leaving the two notes primarily due by G. T. Cawood. A ruling, reply and rejoinder completed the issues, the court sustaining the right of appellees to maintain suit. Upon submission the chancellor adjudged recovery against the administrator and sureties for the face of the notes, subject to credits, and ordered the administratrix to hold the proceeds, first for the benefit of creditors whose rights were safeguarded in pleading, the remainder for distribution.

On appeal it is contended that the administratrix was not entitled to maintain suit before settlement, citing Fidelity & Deposit Co. of Maryland v. Barnes, 275 Ky. 385, 121 S. W. (2d) 915. There is not here, as appeared therein, question of qualification. Appellant joined in motion to require election and at no time, as far as the record shows, moved to account.

In the Barnes case we said that appellees were only entitled to recover the sums claimed, shown upon a complete settlement of their father's estate. We found it impossible to determine in the state of the record what sums, if any, would be due upon settlement. In the instant case there was no uncertainty, since it was agreed that the notes "were unpaid with interest from date, except as to stipulated credits," and there was no counterclaim. The general rule is that where the amount sought to be recovered is known, an accounting is not prerequisite to recovery on a fiducial bond. Hutchcraft v. Shrout's Heirs, 1 T. B. Mon. 206, 15 Am. Dec. 100; Moore v. Waller's Heirs, 1 A. K. Marsh. 488, 490. The question as to the right of Administratrix to maintain suit is not an open one, since the enactment of Kentucky Statutes, Section 3846-1; if not applicable it is noted that she was still plaintiff, joined with the widow and other heirs at law. If error in dismissing the settlement phase, it was brought about by defendants, and was not to their prejudice. Parties should not complain of invited error, Sauerman Bros. v. Roberts, 266 Ky. 815, 100 S. W. (2d) 225.

S. M. Cawood owned 201 acres of land in the vicinity of a proposed, and later developed coal mining opertaion. It was thought to have been an ideal place to establish a mining town, and the brothers believed in

the possibilities. On June 1, 1924, G. T. and J. F. bought it from their brother for $80,000, which, as may be gathered from the record, proved excessive. The consideration was met in the manner as recited with no lien reserved.

As stated the county court in 1927 required additional bond, and it was then that appellant became surety. Ball, one of the original sureties, had died in the meantime; G. T. became bankrupt in 1928, and J. F. was removed July 1, 1930, after additional sureties had signed. With this statement we come to the main controversial question; one of mixed law and fact, which is whether or not sureties are liable for the notes, this depending on whether or not the makers were insolvent at due date, or that no time during the trust J. F. Cawood could pay or collect.

Appellant correctly contends that where an administrator is debtor to the estate, the sureties on his bond are not liable for his failure to pay his, or to collect another's debt, where the administrator throughout the administratorship, and debtor were insolvent or unable to pay, or where the failure to collect of a third party is not due to lack of diligence. Citing Costigan v. Kraus, 158 Ky. 818, 166 S. W. 755, Ann. Cas. 1915D, 115; Buckel v. Smith's Adm'r, 82 S. W. 1001, 26 Ky. Law Rep. 991; Id., 82 S. W. 235, 26 Ky. Law Rep. 494; Williams' Adm'r v. Vonderhaar's Ex'x, 262 Ky. 68, 89 S. W. (2d) 321.

It is argued, assuming that during the period between the death of intestate and the maturity of the notes both signers had been solvent, the notes could not have been collected; this may be correct, but not of controlling import. Further, that if they could not have been collected after maturity because of inability to pay, the sureties may not be held; true, although it may be that if at any time, after due date, the failure to collect from G. T. was due to negligence, sureties would be liable. Kentucky Statutes, Section 3839.

The unsuccessful effort to provide security by attachment or mortgage on the property of G. T. Cawood was lacking in vigor, since it appears he waited until within four months of adjudication of bankruptcy of G. T., and of whose financial condition we feel he should have been aware, due to close associations. Two wit-

nesses, who had agreeably appraised the estate and placed full value on the notes, said they based their valuation on the belief that the makers were then solvent, testified substantially as follows:

"I desire to state that when I made appraisement I evidently thought George and Frank solvent, but I have my doubts as to the fact as to whether my judgment was right or not. I am very much in doubt as to whether they were solvent at the time. I base my answer on the records and what I believe about it now; the developments after the appraisement led me to believe that they were probably not solvent at the time we made the appraisement. They were then heavily involved, and this situation was not known until later."

The county clerk testified from rolls for years 1924 to 1930, showing assessments of property in the name of J. F. Cawood; for 1924 the list showed $3,325; in 1925 the value was $11,650; in 1927, $16,650, and in other years the general average was approximately as in 1927. This evidence is not conclusive as to values of property, or property owned, and here lacks persuasiveness because other proof strongly tends to indicate omissions and undervaluations.

Appellant was one who testified in a way which would tend to show that his principal was insolvent in 1924, in 1927, and at all times during administratorship, but who nevertheless signed as surety because he thought then, and "still thinks," the administrator "was honest and would account for whatever he collected." We find no cause to impugn the honesty of principal.

An accountant testified that J. F. Cawood's direct liabilities in 1924 were $55,000, with assets of $12,000; passing to 1927, his assets had about doubled, but liabilities had increased more than 10%, and in 28 and 29 the same proportionate figures are shown, except that in 1928, about the time the brother became bankrupt, his assets had diminished. As counsel says, "Although he had acquired more property, he had gone into debt for that purpose." The financial status of G. T. was also manifested. Figures show that he was more affluent, but had heavier liabilities. In 1924 his assets were more than $40,000, with liabilities of $72,000. Pass-

ing to 1927, his assets were $61,000, liabilities $212,000. In 1928, $45,000, as against $238,000. In the bankruptcy proceeding his estate yielded an insignificant pro rata. As to each, the accountant expressed opinion both were insolvent during the involved periods. If this were the only proof, we might conclude that during the period, using strict terms, they were insolvent but there was much evidence contra, which tended to show ability to pay, which gave the chancellor ample foundation for concluding that principal and sureties were bound.

It would consume too much space to recount this evidence in detail, but we shall later make reference to portions. In so doing we hold in mind the rule laid down in Costigan v. Kraus, 158 Ky. 818, 166 S. W. 755, Ann. Cas. 1915D, 115, and other cases cited, to some extent relied upon by both parties. In that case it was held that where a debtor to the estate becomes representative, the debt is considered as an asset of the estate in his hands for which he is liable on his bond, but if he is, as generally stated, insolvent throughout his term of trust, the surety will not be charged with his principal's indebtedness. Citing Buckel v. Smith's Adm'r, 82 S. W. 1001, 1002, 26 Ky. Law Rep. 991. The Costigan case is of no great help to us here, except for principle stated, since the opinion did not summarize facts.

It may be gathered from the conclusions expressed that the court found, as had the chancellor, that the notes were "worthless and uncollectible." In the Buckel case we referred to the common-law rule, to the effect that the surety was liable for a debt owed the estate, whether solvent or insolvent, the "Massachusetts rule" (8 A. L. R. 84), and said, if "he was solvent, and the debt could have been collected * * * his failure to account for it should in that case be treated as would his failure to collect a debt owing the estate by any other solvent debtor." Again we are not helped by recital of facts. We did say that it seemed to be admitted that the debtor had some money in bank, and had gotten other which created the debt in question, when he was appointed.

In Hickman v. Kamp's Adm'r, 3 Bush 205, 66 Ky. 205, the question was whether or not the representative who had gone into the Civil War, later sued by a de bonis non, "had sufficient property liable to execution

to have made this debt from the time he administered until he went within the Confederate lines.'' Without summarizing the proof, we found that it was reasonably well established that he had property subject to execution. We remarked ''that a debtor who may take upon himself the administrator of his creditor's estate, and returned upon his inventory his own note, should be held as having collected it, especially when he has property sufficient to pay it liable to execution, we regard as both sound law and sound justice.''

The cases cited qualify the rule laid down in Kirby v. Moore, Ky., 99 S. W. 1156, 30 Ky. Law Rep. 1020, which apparently followed the common law or ''Massachusetts,'' and the minority rule. From a summary it is made to appear that if the principal is able at any time during the trusteeship to collect from another, or discharge his indebtedness, then he and the surety should be chargeable.

As expressed in some cases, in order to avoid liability, he must have been ''hopelessly insolvent.'' Sanders v. Dodge, 140 Mich. 236, 103 N. W. 597, 112 Am. St. Rep. 399. In another case liability of the surety was measured by the ''ability'' of the debtor to pay. McEwen v. Fletcher, 164 Iowa 517, 146 N. W. 1, Ann. Cas. 1916D, 631. In Gay v. Grant, 101 N. C. 206, 8 S. E. 106, the administrator was found able to pay the debt, though insolvent, in the sense that his property was not subject to legal process. Sureties were held. However, we shall not carry this discussion further nor lay down any hard and fast rule in considering the liability of sureties in the instant case, since we have no way of determining whether the chancellor decided that the administrator was solvent during the period of his trust, or whether, in the legal sense, he at times had the ability to pay or was negligent.

At this point we may say the burden of showing insolvency was on those who put forward the defensive plea. Fidelity & Casualty Co. v. Downey, 284 Ky. 72, 73, 143 S. W. (2d) 869, 871. Quoting from Howell v. Anderson, 66 Neb. 575, 92 N. W. 760, 61 L. R. A. 313, and finding the rule therein to be correct, we said:

> '' ' ''The money collected by him while professing to act as agent of the administrator in Missouri, and for which he had not accounted when he became

administrator, was a claim in favor of his trust, which he should have inventoried and charged himself with; and if, by the use of due diligence, all or any part of the claim could have been saved to the estate, his sureties are therewith chargeable, but, if he was hopelessly insolvent, they do not become liable therefor, the burden as to the question of insolvency being on the administrator and his sureties.'' ' Numerous authorities reviewed in the cited case seem to assume that the burden is on the surety in this character of case to establish insolvency and not on the plaintiff to establish solvency. Downey being indebted to the estate at the time of his qualification as committee, it was peculiarly within his knowledge as to whether or not he was solvent and whether or not the indebtedness was collectible.''

Reverting to proof upon which the chancellor reached his conclusion, it is not difficult to observe that during the trusteeship, not only could the personal representative have paid, but might have collected from G. T. Cawood, certainly during the ''boom'' sales of the ''Cawood'' properties jointly owned by them, and which, if it were necessary to decide, was in lien as between the parties for payment of the notes, regardless of the fact of no reservation of lien. Kentucky Statutes, Section 2358; Starbird v. Blair, 227 Ky. 258, 12 S. W. (2d) 693. Total sales of the Cawood property were more than $100,000, and upon which $40,000 had been paid. There were profits upon real estate running through the years more than sufficient to meet the deferred payments, making allowance for surrenders and failures to collect. It is not difficult to conclude with regard to ''Cawood'' that in 1924 and 1925, the principal's interest therein was more than $35,000; G. T. Cawood's interest, as between the purchasers and the estate, substantially the same. As an example of such facts as were relied on to show financial status, one of the owners assessed lots in ''Cawood'' at $200, yet in that year (1928) he sold more than $12,000 worth of lots. The record is replete with evidence that the properties of the two owners were assessed at not more than one-fourth of fair values.

The proof shows that G. T. Cawood in January of 1928 sold an office building for $30,000. He owed on this property $17,000. This mortgage debt was listed not

only for the year 1928, but for 1929. The accountant's figures show that his debts in 1929, after he was adjudged bankrupt, were $225,000. The trustee in bankruptcy found them to be nearer $160,000. The record shows that the two brothers, who were banking on their "bubble" proposition in part, were during all the years, and up to the latter part of 1928, not attempting to meet sacred obligations, but spreading their assets in paying debts to creditors not having claim of priority by reason of fiducial relations.

A fair resumé of the receipts of G. T. Cawood, including "Cawood" from 1924 to 1928, shows an approximate total of more than $275,000, during which time he was increasing rather than attempting to reduce his indebtedness, and overlooking the debts due the estate, though his brother was, or is, insisting that he was liable for the greater portion of the balance due on the deferred "Cawood" payments. The same in a measure may be said in respect of the principal. His sales of the "Cawood" property ran into large figures. Instead of applying receipts to the payments of the estate debt, he was using that money for speculation purposes, though not as extensively as was the brother. They were branching out in merchandising, moving picture and garage business, saying they were losing ventures, though producing income.

The chancellor in reaching his conclusion, whether based on the plea of "hopeless insolvency" or inability to pay or neglect to collect, considered facts which may be briefly catalogued; the properties of the two note makers were greatly undervalued; their assets during the period ran into large figures. Their debts were overestimated. They continued to pay out funds which should have been applied to the payment of these notes, for speculative or business purposes, leaving for future adjustment, if necessary, the proportion of liability as between themselves. There was a lack of showing of diligence on the part of the principal to look to payment, or securement of the portion of the debt due by G. T., for which both were liable.

It is suggested in brief for appellant that "neither of these parties in a positive sense has taken one cent from the estate," inferentially bring in the question of dishonesty. There is none shown, but we cannot accede

to the idea that the administrator owed to the widow and infant children of his brother no duty to exercise more diligence than is demonstrated in undertaking to collect the brother's indebtedness, and a stronger good faith effort in paying his own, particularly when it is not at all difficult to glean from the record that during the entire period and up to G. T. Cawood's bankruptcy, the credit of both was what might be termed good. There appears little suspicion of insolvency until suit.

Whether the chancellor based his decision on one or the other hypotheses, we do not know, nor is it important. Having this view, we must hold that his judgment was correct. If we had no more than a doubt on the question, under consistent rulings, we would be compelled to follow Gilbert v. Gilbert, 275 Ky. 559, 122 S. W. (2d) 137, and cases cited.

After the case was submitted there was motion by appellees for judgment on a third $10,000 note, which it is claimed the proof showed unpaid. The court overruled the motion, and there is cross-appeal. The pleadings did not authorize judgment. It is insisted that prayer for general relief justified judgment. A general prayer is not a cover-all. Coke v. Shanks, 218 Ky. 402, 291 S. W. 362. No relief can be given where not justifid by the pleadings. Before relief may be had under general prayer, such must be consonant with what is specifically prayed, as well as with the case made by the complaint. Crow v. Owensboro & Nashville R. Co., 82 Ky. 134, 6 Ky. Law Rep. 6; Triplett v. Bays, 224 Ky. 353, 355, 6 S. W. (2d) 262. The pleadings did not justify judgment.

Judgment on appeal and cross-appeal affirmed.

Whole Court sitting, except Judge Perry.